IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WHITE PINE INSURANCE COMPANY, | : CIVIL ACTION NO. 2:23-cv-01707-CB |
| Plaintiff, | : |
| v. | : |
| CHASE'S AUTO SALVAGE LLC and JOSEPH M. COX, II, | : |
| Defendants. | : |

**PLAINTIFF'S REPLY TO DEFENDANT JOSEPH M. COX, II'S
RESPONSE TO PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS**

Pursuant to LCvR 56.D, plaintiff, White Pine Insurance Company ("White Pine"), hereby submits this reply to Defendant Joseph M. Cox, II's Response to White Pine's Concise Statement of Material Facts ("CSMF") in support of its Motion for Summary Judgment. Cox does not deny the materiality of any of the facts stated in White Pine's CSMF. He also admits that all but a few of those facts are undisputed. Accordingly, White Pine limits its reply to addressing: (a) the facts Cox denies are undisputed; and (b) his purported additional facts, the majority of which were included in his CSMF in support of his Motion for Summary Judgment (ECF 37-1) and to which White Pine has already responded (ECF 42).[1]

4. The Policy contains an endorsement titled "Amendatory Endorsement – Occupant Hazard" (Form CX6320 (10-15)), which states:

> The following is added to SECTION II., C. Limit of Insurance of the Business Auto Coverage Form and the Motor Carrier Coverage Form and SECTION I – COVERED AUTOS COVERAGES, D.

---

[1] Given that Cox's Memorandum of Law in opposition to White Pine's Motion for Summary Judgment (ECF 39-1) merely incorporates his Memorandum of Law in support of his Motion for Summary Judgment (to which White Pine has already responded (ECF 41)) and makes no additional arguments, White Pine does not submit a Reply Memorandum of Law.

>   Covered Autos Liability Coverage, 5. Limits of Insurance – Covered Autos Liability and SECTION II – GENERAL LIABILITY COVERAGES, F. Limits of Insurance – General Liability Coverages of the Auto Dealers Coverage Form:
>
>>   In the event of "bodily injury" sustained by any "passenger" while in, upon, entering, or alighting from an "auto" that is operated by an "insured", the limit of insurance is amended to the compulsory or financial responsibility law limit where the "auto" is principally garaged.
>
>   The following is added to SECTION V. DEFINITIONS of the Business Auto Coverage Form, Motor Carrier Coverage Form and Auto Dealers Coverage Form:
>
>>   "Passenger" means any person that is not an "employee" who is occupying or attempting to occupy an "auto".
>
>>   "Passenger" does not include customers of the "insured".

**Ex. 1**, Policy, Occupant Hazard Endorsement (Bates numbered WPIC000029).

>   **COX'S RESPONSE:** Admitted. By way of further response, When CHASE'S AUTO SALVAGE renewed its insurance policy with WHITE PINE for the 2017 – 2018 policy period, WHITE PINE, for the first time, inserted this new policy provision into the renewal policy. CHASE understood that he had purchased $100,000.00 worth of liability coverage for his business. [*See* ECF Doc. # 37-2, Exhibit "A" @ T74:2-T75:23, T116:1-15]. The only dollar amount reflected for Bodily Injury Coverage on the Declarations Page is the amount of $100,000.00. [*See* ECF Doc. # 37-2, Exhibit "E" @ Bates Stamped WPIC000203-2041. The WHITE PINE policy specifically states in the section entitled "Limit of "Insurance" that the amount WHITE PINE will pay resulting from any one accident "is the Limit of Insurance for Covered Autos Liability Coverage shown in the Declarations." [*See* ECF Doc. # 37-2, Exhibit "E" @ Bates Stamped WPIC00002201. Nowhere in the section entitled "Limit of "Insurance" [sic] does it state anything about the amount of coverage shown in the Declarations is limited by any policy endorsements. [*See* ECF Doc. # 37-2, Exhibit "E" @ Bates Stamped WPIC00002201. CHASE'S AUTO SALVAGE never requested $15,000.00 in bodily injury coverage for its passengers. [*See* ECF Doc. # 37-2, Exhibit "A" @ T117:14-18; T75:24-T76:61. CHASE testified that nobody ever informed him before July 28, 2018, that CHASE'S AUTO SALVAGE had purchased anything other than $100,000.00 in insurance coverage. [*See* ECF Doc. # 37-2, Exhibit "A" @ T118:3-91.
>
>   **WHITE PINE'S REPLY:** See White Pine's responses to paragraphs 15, 22/23, 25, 27,

28, 33 and 54 of Cox's CSMF.

10. Chase's Auto operates solely within Pennsylvania. **Ex. 2**, Laszlo 2021 Dep., at 85:25-86:9; **Ex. 3**, Laszlo 2024 Dep., at 21:5-11.

> **COX'S RESPONSE:** It is admitted that the cited testimony is what Chase Lazlo testified to. By way of further response, the ISO Code applicable to CHASE's AUTO SALVAGE's trucks, as set forth in WHITE PINE POLICY # WPCS002989, is ISO Code 23103 [*see* ECF Doc. # 37-2 Exhibit "E" @ Bates Stamped WPIC000205], which classifies CHASE'S AUTO SALVAGE's insured vehicles as, a Medium Commercial Truck 231_ _, Tow Truck For-Hire _ _ _ 03. [*See* ECF Doc. # 37-2, Exhibit "BB"]. The MCS-150 Form, required to be completed under Federal Law by CHASE'S AUTO SALVAGE, reported mileage of 189,000 miles for the company's vehicles. [*See* ECF Doc. # 37-2, Exhibit "Y"]. The WHITE PINE Policy lists a radius of operation as 0 – 100 miles. [*See* ECF Doc. # 37-2, Exhibit "E" @ Bates Stamped WPIC000205]. The November 22, 2016, Cox Specialty Markets Commercial Auto Application, lists the "Maximum Radius of Operations" for CHASE's AUTO SALVAGE as 50 miles. [*See* ECF Doc. # 37-2, Exhibit "H" @ P. 4 of 6]. The maximum radius of operation is considered a rating factor by underwriting. [*See* ECF Doc. # 37-2, Exhibit "O" @ T64:25-T65:11; *see also* ECF Doc. # 37-2, Exhibit "Z"]. Joseph Laszlo is CHASE's father and a listed driver under WHITE PINE Policy # WPCS002989. [*See* ECF Doc. # 37-2, Exhibit "E" @ Bates Stamped WPIC000212; *see also* ECF Doc. # 37-2, Exhibit "U"].
>
> Joseph Laszlo identified several photographs depicting a vehicle he owned located on the back of CHASE'S AUTO SALVAGE's 2020 Freightliner FL 70. [*See ECF* Doc. # 37-2, Exhibit "CC" @ T10:11-T16:15 and the photographs attached thereto]. CHASE AUTO SALVAGE'S 2020 Freightliner FL 70 was used to transport Joseph Laszlo's personal vintage automobile back and forth to a body shop to be worked on [*See* ECF Doc. # 37-2, Exhibit "BB" @ T12:5-24 and Exhibits "D" and "E" attached thereto ], and back and forth from his home to CHASE'S AUTO SALVAGE to install an engine [*See* ECF Doc. # 37-2, Exhibit "CC" @ T10:13-23 and Exhibits "F" and "G" attached thereto]. Joseph Laszlo also confirmed that CHASE uses the 2020 Freightliner FL 70 to transport his personal demolition derby cars back and forth to demolition derby events at the Lawrence County Fairgrounds, Butler County Fairgrounds, and Hookstown Fair. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T13:24-T14:15, T18:1-4]. CHASE also transported other people's demolition derby vehicles on one of the trucks owned by CHASE'S AUTO SALVAGE and insured under the WHITE PINE Policy. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T14:16-T15:7 and Exhibit "H" thereto]. Joseph Laszlo identified a red pickup truck, which was not one of CHASE'S AUTO SALVAGE's scrap vehicles on the back of one of the CMVs owned by CHASE'S AUTO SALVAGE and insured under the WHITE PINE Policy. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T15:12-T16:15 and Exhibits "I" and "J" attached thereto].
>
> **WHITE PINE'S REPLY:** See White Pine's responses to paragraphs 79, 81-84 and 87-92 of Cox's CSMF.

15. When not in use, the Freightliner is stored at the Wampum Road address. **Ex. 3**, Laszlo 2024 Dep., at 26:6-16.

> **COX'S RESPONSE:** Denied. By way of further response, Joseph Laszlo identified several photographs depicting a vehicle he owned located on the back of CHASE'S AUTO SALVAGE's 2020 Freightliner FL 70. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T10:11-T16:15 and the photographs attached thereto]. CHASE AUTO SALVAGE'S 2020 Freightliner FL 70 was used to transport Joseph Laszlo's personal vintage automobile back and forth to a body shop to be worked on [*See* ECF Doc. # 37-2, Exhibit "BB" @ T12:5-24 and Exhibits "D" and "E" attached thereto ], and back and forth from his home to CHASE'S AUTO SALVAGE to install an engine [*See* ECF Doc. # 37-2, Exhibit "CC" @ T10:13-23 and Exhibit "F" and "G" attached thereto]. Joseph Laszlo also confirmed that CHASE uses the 2020 Freightliner FL 70 to transport his personal demolition derby cars back and forth to demolition derby events at the Lawrence County Fairgrounds, Butler County Fairgrounds, and Hookstown Fair. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T13:24-T14:15, T18:1-4]. CHASE also transported other people's demolition derby vehicles on one of the trucks owned by CHASE'S AUTO SALVAGE and insured under the WHITE PINE Policy. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T14:16-T15:7 and Exhibit "H" thereto]. Joseph Laszlo identified a red pickup truck, which was not one of CHASE'S AUTO SALVAGE's scrap vehicles on the back of one of the CMVs owned by CHASE'S AUTO SALVAGE and insured under the WHITE PINE Policy. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T15:12-T16:15 and Exhibits "I" and "J" attached thereto].
>
> **WHITE PINE'S REPLY:** The facts stated in paragraph 15 of White Pine's CSMF should

be deemed admitted because Cox's purported additional facts do not refute that, when not in use,

the Freightliner is stored at Chase's Auto's business premises, located at 1324 Wampum Road,

Ellwood City, Pennsylvania. By way of further reply, White Pine incorporates herein its responses

to paragraphs 88-92 of Cox's CSMF.

16. The only items that Chase's Auto transports are its own property. **Ex. 3**, Laszlo 2024 Dep., at 24:15-19.

> **COX'S RESPONSE:** Denied. By way of further response, Joseph Laszlo identified several photographs depicting a vehicle he owned located on the back of CHASE'S AUTO SALVAGE's 2020 Freightliner FL 70. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T10:11-T16:15 and the photographs attached thereto]. CHASE AUTO SALVAGE'S 2020 Freightliner FL 70 was used to transport Joseph Laszlo's personal vintage automobile back and forth to a body shop to be worked on [*See* ECF Doc. # 37-2, Exhibit "BB" @ T12:5-24 and Exhibits "D" and "E" attached thereto ], and back and forth from his home to CHASE'S AUTO SALVAGE to install an engine [*See* ECF Doc. # 37-2, Exhibit "CC" @ T10:13-23 and Exhibit "F" and "G" attached thereto]. Joseph Laszlo also confirmed that

CHASE uses the 2020 Freightliner FL 70 to transport his personal demolition derby cars back and forth to demolition derby events at the Lawrence County Fairgrounds, Butler County Fairgrounds, and Hookstown Fair. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T13:24-T14:15, T18:1-4]. CHASE also transported other people's demolition derby vehicles on one of the trucks owned by CHASE'S AUTO SALVAGE and insured under the WHITE PINE Policy. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T14:16-T15:7 and Exhibit "H" thereto]. Joseph Laszlo identified a red pickup truck, which was not one of CHASE'S AUTO SALVAGE's scrap vehicles on the back of one of the CMVs owned by CHASE'S AUTO SALVAGE and insured under the WHITE PINE Policy. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T15:12-T16:15 and Exhibits "I" and "J" attached thereto].

**WHITE PINE'S REPLY:** The facts stated in paragraph 16 of White Pine's CSMF should be deemed admitted because Cox's purported additional facts do not refute that the only items Chase's Auto transports are its own property. Instead, Cox's purported additional facts indicate, at most, that Chase Laszlo occasionally made personal use of Chase's Auto's truck(s) to transport property of third parties, for which he did not receive any compensation. By way of further reply, White Pine incorporates herein its responses to paragraphs 88-92 of Cox's CSMF.

17.     Chase's Auto has never been hired or offered to transport anyone else's vehicles, household goods, or other property, or any passengers, for compensation. **Ex. 3**, Laszlo 2024 Dep., at 23:18-24:1-2; 24:8-19.

**COX'S RESPONSE:** Denied. By way of further response, Joseph Laszlo identified several photographs depicting a vehicle he owned located on the back of CHASE'S AUTO SALVAGE's 2020 Freightliner FL 70. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T10:11-T16:15 and the photographs attached thereto]. CHASE AUTO SALVAGE'S 2020 Freightliner FL 70 was used to transport Joseph Laszlo's personal vintage automobile back and forth to a body shop to be worked on [*See* ECF Doc. # 37-2, Exhibit "BB" @ T12:5-24 and Exhibits "D" and "E" attached thereto ], and back and forth from his home to CHASE'S AUTO SALVAGE to install an engine [*See* ECF Doc. # 37-2, Exhibit "CC" @ T10:13-23 and Exhibits "F" and "G" attached thereto]. Joseph Laszlo also confirmed that CHASE uses the 2020 Freightliner FL 70 to transport his personal demolition derby cars back and forth to demolition derby events at the Lawrence County Fairgrounds, Butler County Fairgrounds, and Hookstown Fair. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T13:24-T14:15, T18:1-4]. CHASE also transported other people's demolition derby vehicles on one of the trucks owned by CHASE'S AUTO SALVAGE and insured under the WHITE PINE Policy. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T14:16-T15:7 and Exhibit "H" thereto]. Joseph Laszlo identified a red pickup truck, which was not one of CHASE'S AUTO SALVAGE's scrap vehicles on the back of one of the CMVs owned by CHASE'S

AUTO SALVAGE and insured under the WHITE PINE Policy. [*See* ECF Doc. # 37-2, Exhibit "CC" @ T15:12-T16:15 and Exhibits "I" and "J" attached thereto].

**WHITE PINE'S REPLY:** The facts stated in paragraph 17 of White Pine's CSMF should be deemed admitted because Cox's purported additional facts do not refute that Chase's Auto has never been hired or offered to transport anyone else's vehicles, household goods, or other property, or any passengers, for compensation.  Instead, Cox's purported additional facts indicate, at most, that Chase Laszlo occasionally made personal use of Chase's Auto's truck(s), such as transporting his father's personal vintage automobile to and from repair shops and transporting Chase Laszlo's personal demolition derby cars to demolition derby events.  Chase Laszlo did not charge for transporting his father's personal vintage automobile. **ECF 37-2, Ex. CC**, Joseph Laszlo Dep., at 18:5-8.  Nor is there any evidence in the record that Chase Laszlo received compensation for transporting his own demolition derby cars or the red pickup truck referenced in Cox's purported additional facts.  By way of further reply, White Pine incorporates herein its responses to paragraphs 88-92 of Cox's CSMF.

24. Laszlo did not know Cox would be "showing up" to the Salvage Yard on July 28, 2018. **Ex. 3**, Laszlo 2024 Dep., at 29:16-19.

**COX'S RESPONSE:** It is admitted that the above reflects Chase Lazlo's cited testimony. By way of further response, during his deposition in the underlying bodily injury case, CHASE's testimony was a little different. At that time, he testified as follows:

```
17      Q.   Okay.  Did he just happen to show up
18   that morning?
19      A.   I -- I guess you could say he showed
20   up, yeah.  He knew where I was going, and the --
21   the place I was going to to pick up some
22   materials, the guy that owns it has stuff that Joe
23   is interested in, and he would buy and sell
24   things.  So he sort of tagged along to see if that
25   guy had anything he was interested in as well.
```

[*See* ECF Doc. # 37-2, Exhibit "B" @ T25:17-25].

```
 7    A.   He probably knew because I probably
 8  told him that I was going there because it was --
 9  he had went to that place with me before and more
10  or less said, hey, if you go there again, you
11  know, let me know.  So I would say he was aware
12  that that's where I was going.
```

[*See* ECF Doc. # 37-2, Exhibit "B" @ T26:1-12].

```
16    Q.   Now, on the day of the accident -- I
17  didn't understand, so if you can explain to me --
18  what was Joe doing with you?  Why were you and he
19  together that day?
20    A.   He knew that I was going to
21  Mr. Grinnen's property, and he has things that Joe
22  likes.  He likes ATVs, dirt bikes, those things,
23  and that guy would typically have parts and
24  pieces, and he would go along with me and see if
25  he could purchase any of that stuff or trade or
 2  things like that.
 3    Q.   So Joe had been with you to this
 4  property before?
 5    A.   Yes.
 6    Q.   About how many times?
 7    A.   One to two times, I believe.  At least
 8  once, maybe twice.
 2  things like that.
 3    Q.   So Joe had been with you to this
 4  property before?
 5    A.   Yes.
 6    Q.   About how many times?
 7    A.   One to two times, I believe.  At least
 8  once, maybe twice.
```

[*See* ECF Doc. # 37-2, Exhibit "B" @ T94:16-95:8].

-7-

**WHITE PINE'S REPLY:** Admitted, but, as stated in White Pine's response to paragraph 9 of Cox's CSMF, any differences between the referenced deposition testimony of Laszlo are immaterial to the interpretation and application of the Occupant Hazard Endorsement.

25.   Cox was interested in looking at quads Grinnen was offering for sale, so Cox "tagged along" with Laszlo to the Grinnen Storage Facility on July 28, 2018. **Ex. 4**, Cox 2021 Dep., at 39:20-40:2; **Ex. 5**, Cox 2024 Dep., at 13:13-17; **Ex. 2**, Laszlo 2021 Dep., at 25:17-25; **Ex. 3**, Laszlo 2024 Dep., at 30:23-31:6.

**COX'S RESPONSE:** It is admitted that Cox was interested in looking at quads at Grinnen's Storage Facility. It is denied that Cox, "tagged along". By way of further response, during his deposition in the underlying bodily injury case, CHASE's testimony was a little different. At that time, he testified as follows:

```
17      Q.   Okay.  Did he just happen to show up
18   that morning?
19      A.   I -- I guess you could say he showed
20   up, yeah.  He knew where I was going, and the --
21   the place I was going to to pick up some
22   materials, the guy that owns it has stuff that Joe
23   is interested in, and he would buy and sell
24   things.  So he sort of tagged along to see if that
25   guy had anything he was interested in as well.
```

[*See* ECF Doc. # 37-2, Exhibit "B" @ T25:17-25].

```
 7      A.   He probably knew because I probably
 8   told him that I was going there because it was --
 9   he had went to that place with me before and more
10   or less said, hey, if you go there again, you
11   know, let me know.  So I would say he was aware
12   that that's where I was going.
```

[*See* ECF Doc. # 37-2 ECF Doc. # 37-2, Exhibit "B" @ T26:1-12].

```
16        Q.   Now, on the day of the accident -- I
17   didn't understand, so if you can explain to me --
18   what was Joe doing with you?  Why were you and he
19   together that day?
20        A.   He knew that I was going to
21   Mr. Grinnen's property, and he has things that Joe
22   likes.  He likes ATVs, dirt bikes, those things,
23   and that guy would typically have parts and
24   pieces, and he would go along with me and see if
25   he could purchase any of that stuff or trade or
 2   things like that.
 3        Q.   So Joe had been with you to this
 4   property before?
 5        A.   Yes.
 6        Q.   About how many times?
 7        A.   One to two times, I believe.  At least
 8   once, maybe twice.
 2   things like that.
 3        Q.   So Joe had been with you to this
 4   property before?
 5        A.   Yes.
 6        Q.   About how many times?
 7        A.   One to two times, I believe.  At least
 8   once, maybe twice.
```

[*See* ECF Doc. # 37-2, Exhibit "B" @ T94:16-95:8].

With respect to the events of July 28, 2018, COX described how he came to be in CHASE's AUTO SALVAGE's CMV as follows:

```
15       Q       On July 28, 2018, did you go to Chase's
16  shop?
17       A       Yes.
18       Q       About what time did you go to Chase's shop?
19       A       Approximately around 12:00.
20       Q       Why did you go to Chase's shop?
21       A       We were supposed to go -- he was going to
22  go look at some cages, possibly buy it, and the guy
23  had quads that he was thinking about selling, that I
24  could look at.
25       Q       Chase was going to look at cages. You were
 1  going to potentially look at a quad to buy?
 2       A       Yes.
 3       Q       Who was the guy?
 4       A       I'm not sure who it was.
 5       Q       When were the arrangements made to go look
 6  at the cages and the quads?
 7       A       About a week prior.
 8       Q       Who made the arrangements?
 9       A       Chase did with the owner.
```

[*See* ECF Doc. # 37-2, Exhibit "C" @ T39:15-T40:9; see also Exhibit "D" @ T13:13-22, T17:11-T18:7].

**WHITE PINE'S REPLY:** Admitted, but, as stated in White Pine's response to paragraph 9 of Cox's CSMF, any differences between the referenced deposition testimony of Laszlo are immaterial to the interpretation and application of the Occupant Hazard Endorsement.

32.   On the day of the Accident, Cox did not purchase any goods or services from, or do any other business with, Laszlo/Chase's Auto. **Ex. 5**, Cox 2024 Dep. at 16:16-17:4.

**COX'S RESPONSE:** The statement as phrased is admitted. By way of further response, COX testified as follows:

```
 3       Q       Was there a particular reason you and he
 4  took the Freightliner rather than some other vehicle?
 5       A       Just in case he did buy them, we could get
 6  the stuff on the bed and bring it back to his yard.
```

[*See* ECF Doc. # 37-2, Exhibit "C" @ T39:15-T40:9; *see also* ECF Doc. # 37-2, Exhibit "D" @ T18:16-22]. There was clearly an intention that COX might end up purchasing

-10-

something from Steve Grinnen's which, if purchased, would have needed to be transported back to the Salvage yard where CHASE and COX met up to drive over together. Unfortunately, due to the crash, COX never got the opportunity to look at the ATVs, dirk [sic] bike and things to possibly purchase.

**WHITE PINE'S REPLY:** White Pine admits only that Cox gave, in part, the testimony excerpted in Cox's response and that Cox did not look at any items Grinnen was offering for sale on the day of the Accident. White Pine denies Cox's remaining purported additional facts on the grounds they are speculative, hypothetical and not supported by evidence of record. By way of further response, at his deposition in this action, Laszlo testified that he would have expected Cox to use his own vehicle to transport any item he might have purchased from Grinnen on the day of the Accident. **ECF 37-2, Ex. A**, Laszlo 2024 Dep., at 88:21-89:8. Further, at his deposition in this action, Cox testified that he would not have expected Laszlo, his friend, to charge for transporting any item Cox might have purchased from Grinnen on the day of the Accident. **ECF 43, Ex. 7,** Cox 2024 Dep., at 19:6-13.

33. On the day of the Accident, Laszlo had no intention of doing business with Cox, such as selling items to him. **Ex. 3**, Laszlo 2024 Dep., at 32:4-12.

**COX'S RESPONSE:** It is admitted that the above correctly cites Chase Lazlo's testimony. By way of further response, COX testified as follows:

```
3    Q    Was there a particular reason you and he
4  took the Freightliner rather than some other vehicle?
5    A    Just in case he did buy them, we could get
6  the stuff on the bed and bring it back to his yard.
```

[*See* ECF Doc. # 37-2, Exhibit "C" @ T39:15-T40:9; *see also* ECF Doc. # 37-2, Exhibit "D" @ T18:16-22]. In addition, Chase Lazlo [sic] also testified that CHASE believed that COX had been to Steve Grinnen's in the past and "he often had things for sale that he found interesting. So, since he [COX] knew I was going there, he rode along with me." [*See* ECF Doc. # 37-2, Exhibit "A" @ T30:23-T31:4; T31:23-T32:3].

```
11        Q.    So on July 28th, when you guys were
12   going over there, even if you didn't have a
13   predesigned plan, once he knew you were going to
14   Steve Grinnen's, you knew he was going to go there
15   because there might be things he was interested in
16   purchasing, correct?
17        A.    Correct.
18        Q.    And he drove over there with you,
19   correct?
20        A.    Correct.
```

[*See* ECF Doc. # 37-2, Exhibit "A" @ T88:11-20].

```
17        Q.    Okay.  Did he just happen to show up
18   that morning?
19        A.    I -- I guess you could say he showed
20   up, yeah.  He knew where I was going, and the --
21   the place I was going to to pick up some
22   materials, the guy that owns it has stuff that Joe
23   is interested in, and he would buy and sell
24   things.  So he sort of tagged along to see if that
25   guy had anything he was interested in as well.
```

[*See* ECF Doc. # 37-2, Exhibit "B" @ T25:17-25].

```
16      Q.    Now, on the day of the accident -- I
17   didn't understand, so if you can explain to me --
18   what was Joe doing with you?  Why were you and he
19   together that day?
20      A.    He knew that I was going to
21   Mr. Grinnen's property, and he has things that Joe
22   likes.  He likes ATVs, dirt bikes, those things,
23   and that guy would typically have parts and
24   pieces, and he would go along with me and see if
25   he could purchase any of that stuff or trade or

 2   things like that.
 3      Q.    So Joe had been with you to this
 4   property before?
 5      A.    Yes.
 6      Q.    About how many times?
 7      A.    One to two times, I believe.  At least
 8   once, maybe twice.
```

[*See* ECF Doc. # 37-2, Exhibit "B" @ T94:16-95:8]. It does not seem too farfetched that if CHASE'S AUTO SALVAGE'S frequent customer, COX, is accompanying CHASE LAZLO [sic] to a place where CHASE advised COX he was going to, knew that COX was interested in possibly purchasing something from that place, and CHASE drove the Flatbed truck, CHASE'S AUTO SALVAGE might have end up doing business with JOE [sic] if he ended up purchasing something from Steve Grinnen's and needed to transport it back to the Salvage Yard where they met up. Unfortunately, due to the crash, COX never got the opportunity to look at the ATVs, dirk bike [sic] and other things to possibly purchase.

**WHITE PINE'S REPLY:** White Pine admits only that Laszlo gave, in part, the testimony excerpted in Cox's response and that Cox did not look at any items Grinnen was offering for sale on the day of the Accident. White Pine denies Cox's remaining purported additional facts on the grounds they are speculative, hypothetical and not supported by evidence of record. By way of further response, at his deposition in this action, Laszlo testified that he would have expected Cox to use his own vehicle to transport any item Cox purchased from Grinnen on the day of the Accident. **ECF 37-2, Ex. A**, Laszlo 2024 Dep., at 88:21-89:8. Further, at his deposition in this action, Cox testified that he would not have expected Laszlo, his friend, to charge for transporting

any item Cox might have purchased from Grinnen on the day of the Accident.  **ECF 43, Ex. 7, Cox 2024 Dep., at 19:6-13.**

                Respectfully submitted,

                WHITE AND WILLIAMS LLP

                /s/Paul A. Briganti
                Gregory T. LoCasale
                Paul A. Briganti
                1650 Market Street
                One Liberty Place, Suite 1800
                Philadelphia, PA  19103-7395
                215.864.7000
                locasaleg@whiteandwilliams.com
                brigantip@whiteandwilliams.com

                Attorneys for Plaintiff,
                White Pine Insurance Company

Dated: February 5, 2025